UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| NICHOLAS GUENTHER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) CAUSE NO. 3:13CV669-PPS |
| vs. | ) |
| | ) |
| DR. NADIR AL-SHAMI, et al., | ) |
| | ) |
| Defendants. | ) |

## **OPINION AND ORDER**

Nicholas Guenther, a *pro se* prisoner, claims to have received inadequate medical care while he was incarcerated at the Porter County Jail. (DE 11.) Specifically, he alleges that he experienced increasingly debilitating symptoms and Dr. Al-Shami failed to provide him with any medical care for these problems, other than to run a few blood tests. In addition, Guenther alleges that he personally met with Warden Widup and told him that his medical needs were not being properly treated, but after that meeting he still did not receive adequate medical care. These two defendants have separately moved for summary judgment. (DE 70, 73.) Because there is no evidence that either of these defendants was deliberately indifferent to any serious medical need, their motions for summary judgment will be granted.

### **Background**

Guenther was booked into the Porter County Jail on December 20, 2012. (Dr. Al-Shami Aff. at ¶ 6, DE 71-1.) Dr. Al-Shami was a physician working at the jail as an employee of Advanced Correctional Healthcare. (Id. at ¶ 2.) On December 21, 2012,

Guenther received a medical screening by a medical assistant. (DE 71-1; Guenther's Medical records, DE 71-2 at 1, 2.) Guenther revealed that he had diabetes, mental health issues and was under a doctor's care. (DE 71-2 at 1, 2.) Because Guenther did not report taking any medications for diabetes, Dr. Al-Shami decided to examine his blood sugar to determine if he needed any medication. (Id.) Dr. Al-Shami ordered blood sugar checks twice a day. (Id.) Guenther's blood sugar continued to be checked twice a day until December 30, 2012. (DE 71-2 at 39.) On January 1, 2013, Dr. Al-Shami ordered Guenther a diabetic diet. (Id.)

On January 3, 2013, Dr. Al-Shami examined Guenther. (Id. at ¶ 8; DE 71-2 at 5.) Guenther reported a history of low testosterone and weight loss; he weighed 140 pounds. (Id.) Dr. Al-Shami finds it common for people to lose weight for the first few months after they enter jail and adjust to a different diet. (Id.) So Dr. Al-Shami was not worried about Guenther's weight but, to be safe, thought it should be monitored and ordered a weekly weight check. (Id.) Dr. Al-Shami then obtained Guenther's medical records from his outside medical provider. (Id.) On January 23, 2013, based on information contained in those records, Dr. Al-Shami prescribed Androgel gel for Guenther's low testosterone. (Id.)

On April 18, 2013, Dr. Al-Shami examined Guenther again, who complained of blurred vision, tingling in his head, swelling in his face and that the glands in his neck were sore. (Id. at 10; DE 71-2 at 20.) Notably, Guenther's weight was up to 156 pounds. Dr. Al-

2

Shami's assessment was that Guenther had an allergic reaction to something. (Id.) As a result, he prescribed Prednisone.[1] (Id.)

Dr. Al-Shami examined Guenther again a week later, when he complained of swelling in his groin and in the glands of his neck, tingling and weakness "all over" for the past 8 months, and headaches. (Id. at ¶ 11; DE 71-2 at 22.) Dr. Al-Shami performed an examination, but did not notice that the glands in Guenther's neck were swollen. (Id.) Dr. Al-Shami also noted that Guenther's complaints of lymph node swelling, tingling, and weakness were not new, as the medical records received from his outside physician showed that Guenther made these same complaints in May 2012. (Id.; DE 71-2 at 10-17, 22.) Dr. Al-Shami did not believe that Guenther had any serious, acute issues resulting in these symptoms. (Id.) Guenther did not report anything that would explain his symptoms and Dr. Al-Shami's physical exam of him did not explain or confirm any of these complaints or suggest a cause for them. (Id.) Dr. Al-Shami did order a check of his testosterone level and a complete blood count ("CBC").

On May 3, 2013, Dr. Al-Shami learned the results of Guenther's CBC. (Id. at ¶ 12; DE 71-2 at 24.) The only two items not in normal range were Guenther's mean platelet volume and testosterone level. (Id.) Although not in the normal range, Dr. Al-Shami found Guenther's mean platelet volume not to be clinically significant. (Id.) Dr. Al-Shami continued Guenther's Androgel prescription for the low testosterone level. (Id.)

---

[1] Prednisone is used to treat a number of conditions including severe allergies. See Prednisone, WEBMD, www.webmd.com/drugs2/drug-6007-9383/prednisone-oral/details. (Last visited July 18, 2016).

On May 16, 2013, Dr. Al-Shami again examined Guenther. (Id. at 13; DE 71-2 at 25.) This time, Guenther complained of muscle weakness in his wrist and groin, tingling and burning in his head and cloudy vision, and mentioned that all of his problems started 8 months ago. (Id.) Guenther did not report any history that would explain his symptoms and Dr. Al-Shami's examination did not explain or confirm any of these complaints or suggest a cause for them. (Id.) Dr. Al-Shami prescribed Gabapentin - used for nerve pain and complaints of tinging and burning - which is the same medication that Guenther's outside doctors prescribed for these same complaints. (Id.; DE 71-2 at 10-17.) Because of Guenther's many complaints, none of which could be confirmed, Dr. Al-Shami thought Guenther might have a psychiatric component that was causing some of his symptoms. (Id.) So Dr. Al-Shami advised Guenther that if the Gabapentin did not alleviate some of the symptoms, he would prescribe an antidepressant or anti-anxiety drug. (Id.)

Guenther refused to attend his scheduled May 30, 2013, exam with Dr. Al-Shami. (Id. at ¶ 14; DE 71-2 at 28-29.) The next day, Dr. Al-Shami instructed the nursing staff to draw a blood sample to check on the status of Guenther's diabetes. (Id.; DE 71-2 at 30.) The test indicated that Guenther was no longer diabetic and Dr. Al-Shami discontinued the blood sugar checks. (Id.; DE 71-2 at 31.)

On June 6, 2013, Dr. Al-Shami again examined Guenther, who had multiple complaints. (Id. at ¶ 18; DE 71-2 at 33.) Dr. Al-Shami ordered testing of Guenther's testosterone level, a sedimentation rate, and a one-time fasting blood sugar, to confirm that

he was not diabetic. (Id.) Dr. Al-Shami reviewed Guenther's testosterone level, which was within the normal range. (Id.)

On June 24, 2013, Guenther met with Warden Widup. (Widup Aff. ¶ 4, DE 74-3; Am. Cmplt at 4.) Guenther advised the warden of his lack of faith in Dr. Al-Shami and disagreed with how the doctor was treating his conditions. (Id.) Guenther believed that further tests should be performed. (Id. at ¶ 13.) The warden suggested that Guenther wait until the new medical care provider, Correct Care Solutions ("CCS"), took over on July 1, 2013, to see if things improved. (Id. at ¶ 5.) The warden advised Guenther that he would make sure that the new jail doctor evaluated his condition. (Id.) Guenther agreed to wait until he could be seen by the new jail doctor affiliated with CCS. (Id.) Warden Widup also received a phone call from Guenther's father around this time. (Id. at ¶ 6.) He told Guenther's father the same thing he told Guenther - that a new jail physician would be starting soon. (Id.) It was agreed that Guenther would be seen and assessed by the new medical provider. (Id.) Warden Widup also followed up with the ACH medical staff. (Id. at ¶ 7.) He learned that various tests had been performed on Guenther and that all of them returned normal results, except that Guenther had low testosterone, which was being treated through prescription medications ordered by Dr. Al-Shami. (Id.)

Dr. Al-Shami next examined Guenther on June 27, 2013. (DE 71-1 at ¶ 20; DE 71-2 at 38.) Guenther had multiple complaints, including chest pain. (Id.) However, Dr. Al-Shami did not think he had any cardiac issue because his pulse and blood pressure did not indicate an acute heart problem. (Id.) Because Guenther still had multiple, unconfirmed

5

complaints, Dr. Al-Shami decided to try him on Buspar, an anti-anxiety psychiatric medication. (Id.)

On June 30, 2013, Advanced Correctional Healthcare's contract with the Porter County Sheriff ended. (Id. at ¶ 4.) After this date, Dr. Al-Shami stopped working at the jail and had no further involvement in Guenther's medical care. (Id.) When the new jail provider took over, Warden Widup requested that the medical director schedule Guenther an appointment with the new jail doctor. (DE 74-3 at ¶ 8.) Warden Widup followed up and was informed that Guenther was seen by the new jail doctor. (Id. at ¶ 9.) All tests returned normal results, except that Guenther's testosterone level again tested low. (Id.) Warden Widup was advised that Guenther was being treated for this condition through prescription medicines. (Id.) Upon learning this information, Warden Widup did not believe that Guenther was being denied adequate medical treatment and did not have any further involvement in his medical treatment while at the Porter County Jail. (Id at ¶ 14.)

**Discussion**

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Not every dispute between the parties makes summary judgment inappropriate; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* To

determine whether a genuine issue of material fact exists, I must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010). Nevertheless, a party opposing summary judgment may not rely on allegations or denials in his or her own pleading, but rather must "marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010).

Guenther was given proper notice of the motions by the defendants. (DE 72, 75.) I then granted him until July 18, 2016, to respond. (DE 76.) In response, Guenther wrote a letter indicating that he no longer wants to pursue this lawsuit, due to a lack of evidence. (DE 77.) He blames his lack of evidence on a number of things, including the defendants' "corruption to hide the truth." (Id.) There is simply no basis to find that the defendants' engaged in any wrongdoing throughout this case. Moreover, the lack of any documents did not preclude him from responding to the summary judgment motions or disputing the facts of the case.

Guenther has personal knowledge of his interaction with the defendants, what symptoms he experienced and when he experienced them, and his medical treatment. Thus, how the events unfolded, what treatment he received, and what he knows about the defendants' responses to his complaints are all matters within his personal knowledge that he could have brought to bear against the potentially dispositive motions. Rather than grant leave to voluntarily dismiss the case when the summary judgment motions are ripe and present the opportunity to adjudicate the case on the merits, I find it appropriate to

make the finding that given the undisputed facts, summary judgment is proper as a matter of law.

To establish liability under the Eighth Amendment, a prisoner must show: (1) his medical need was objectively serious; and (2) the defendant acted with deliberate indifference to his medical need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994.) A medical need is "serious" if it is one that a physician has diagnosed as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention, and if untreated could result in further significant injury or unnecessary pain, and that significantly affects the person's daily activities or features chronic and substantial pain. *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). Deliberate indifference is a high standard, and is "something approaching a total unconcern for a prisoner's welfare in the face of serious risks," or a "conscious, culpable refusal" to prevent harm. *Duane v. Lane*, 959 F.2d 673, 677 (7th Cir. 1992); *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005).

Guenther's first claim is that Dr. Al-Shami provided him with inadequate medical treatment by ignoring his medical problems. For a medical professional to be held liable for deliberate indifference to an inmate's medical needs, he must make a decision that represents "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008). As the Seventh Circuit has explained:

> [M]edical professionals are not required to provide proper medical treatment to prisoners, but rather they must provide medical treatment that reflects professional judgment, practice, or standards. There is not one proper way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in the field. A medical professional's treatment decisions will be accorded deference unless no minimally competent professional would have so responded under those circumstances.

*Id.* at 697-698. Negligence, incompetence, or even medical malpractice do not amount to deliberate indifference. *Pierson v. Hartley*, 391 F.3d 898, 902 (7th Cir. 2004); *Walker v. Peters*, 233 F.3d 494, 499 (7th Cir. 2000).

Furthermore, a prisoner is not entitled to demand specific care, nor is he entitled to the "best care possible." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir.1997). Where the defendants have provided some level of care for a prisoner's medical condition, in order to establish deliberate indifference the prisoner must show that "the defendants' responses to [his condition] were so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs." *Hayes v. Synder*, 546 F.3d 516, 524 (7th Cir. 2008). A mere disagreement with medical professionals about the appropriate treatment does not amount to an Eighth Amendment violation. *Ciarpaglini v. Saini*, 352 F.3d 328, 331 (7th Cir. 2003).

There is no evidence from which a reasonable jury could conclude that Dr. Al-Shami was deliberately indifferent to Guenther's medical needs. Guenther alleged in his complaint that Dr. Al-Shami essentially ignored his deteriorating health and did no more than have "simple lab work" performed. (DE 10 at 3.) But the record belies this. Dr. Al-

Shami met regularly with Guenther since his arrival at the jail, performed various tests and examinations, prescribed him medications, and monitored his medical condition.

When Guenther complained of weight loss, Dr. Al-Shami monitored his weight. When he alleged to be diabetic, Dr. Al-Shami conducted blood sugar tests twice a week and placed him on a diabetic diet. When he complained about low testosterone levels, Dr. Al-Shami tested his testosterone levels and prescribed Androgel. When he complained about tingling, numbness and burning sensations, Dr. Al-Shami conducted an examination and prescribed Gabapentin. Throughout the course of Guenther's treatment, Dr. Al-Shami had direct contact on numerous occasions with nurses at the jail to discuss Guenther's lab work, testosterone levels, and prior medical records. Far from being deliberately indifferent, these are all actions of an attentive, concerned doctor.

It is true that many of Guenther's complaints were never resolved. However, this was not the result of any deliberate indifference. Instead, it was based on the medical opinion of Dr. Al-Shami, who was not able to determine any injury, history or objective finding that explained Guenther's many complained-of symptoms. In his amended complaint, Guenther suggests that Dr. Al-Shami could have determined what was wrong with him by conducting additional testing. But questions of whether certain diagnostic tests are warranted are "a classic example of a matter for medical judgment." *Estate of Cole ex rel. Pardue v. Fromm*, 94 F.3d 254, 261 (7th Cir. 1996) (quotation omitted). Guenther's disagreement with Dr. Al-Shami's medical judgment over the proper course of treatment does not establish an Eighth Amendment violation. *Berry*, 604 F.3d at 44. Because the record

is devoid of any evidence that Dr. Al-Shami was deliberately indifferent to Guenther's medical treatment, I will grant his motion for summary judgment.

Guenther's remaining claim is that Warden Widup failed to assist him in obtaining adequate medical care after their June 24, 2013, meeting. Generally, non-medical defendants, such as Warden Widup, are entitled to rely on medical professionals' determinations regarding inmates' medical care. *See Hayes v. Snyder*, 546 F.3d 516, 526 (7th Cir. 2008); *Johnson v. Doughty*, 433 F.3d 1001, 1012 (7th Cir. 2006); *Greeno*, 414 F.3d at 855-56. Because non-medical personnel are not directly involved in an inmate's medical care, they are usually not liable for it. *Gevas v. Mitchell*, 492 Fed. Appx. 654, 660 (7th Cir. 2012). However, there is one exception to this rule. "Nonmedical officers may be found deliberately indifferent if they have a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *McGee v. Adams*, 721 F.3d 474, 483 (7th Cir. 2013) (citations and quotations omitted); *Hayes,* 546 F.3d at 527.

Here, based on the evidence presented, no reasonable jury could review the facts of this case and find that Warden Widup was deliberately indifferent to Guenther's medical care. As a threshold matter, because the evidence reveals Dr. Al-Shami provided Guenther with adequate medical care, it logically follows that Warden Widup cannot be liable for failing to intervene. Nevertheless, Warden Widup did not ignore Guenther's complaints.

After their June 24 meeting, the warden investigated the complaints by examining Guenther's medical records to ensure that he was receiving medical treatment from Dr. Al-Shami. Warden Widup then ensured that the new jail physician examined and provided

11

any necessary medical treatment to Guenther. Warden Widup did all that was required and after his investigation, he found that the prison doctors were medically treating Guenther. Because there is no evidence in the record that Warden Widup was deliberately indifferent to Guenther's medical care, I will grant his motion for summary judgment, too.

**Conclusion**

For these reasons, the Court:

(1) **GRANTS** defendant Dr. Al-Shami's motion for summary judgment (DE 70);

(2) **GRANTS** defendant Warden Widup's motion for summary judgment (DE 73); and

(3) **DIRECTS** the Clerk to enter judgment in favor of the defendants.

**SO ORDERED**.

ENTERED: July 25, 2016.

　　　　　　　　　　　　　　　　　　/s/ Philip P. Simon
　　　　　　　　　　　　　　　　　Chief Judge
　　　　　　　　　　　　　　　　　United States District Court